EMMETT JOHNSON, III,

              **Plaintiff,**           **CIVIL ACTION NO. 07-10963**

      **vs.**                **DISTRICT JUDGE THOMAS L. LUDINGTON**

                        **MAGISTRATE JUDGE MONA K. MAJZOUB**

**COMMISSIONER OF**
**SOCIAL SECURITY,**

              **Defendant.**
_____/


## REPORT AND RECOMMENDATION

**RECOMMENDATION:**     Plaintiff's Motion for Summary Judgment should be DENIED, and

that of Defendant GRANTED, as there was substantial evidence on the record that Plaintiff

remained capable of performing a significant number of jobs in the economy.

*** 

     Plaintiff filed an application for disability and Disability Insurance Benefits on June 17,

2003, alleging that he had been disabled and unable to work since March 2, 2002 as a result of injury

to his back and neck and high blood pressure. (TR 47, 48, 56). The Social Security Administration

denied benefits. (TR 24, 26). A requested *de novo* hearing was held on August 30, 2005 before

Administrative Law Judge (ALJ) Patti L. Hunter. (TR 19, 301). The ALJ subsequently found that

the claimant was entitled to a closed period of disability from March 2, 2002 through November 17,

2003 and Disability Insurance Benefits consistent therewith. (TR 23). The Appeals Council

declined to review the ALJ's decision and Plaintiff commenced the instant action for judicial review.


(TR 6). The parties filed Motions for Summary Judgment. The issue Plaintiff raises for review is

whether the ALJ's decision was supported by substantial evidence on the record.

Plaintiff was forty-six years old at the time of the administrative hearing. (TR 305). Plaintiff has a tenth grade education and past work experience as a carpenter's helper and a tile finisher. (TR 57, 62, 305, 323). Plaintiff lives with his spouse. (TR 305). Plaintiff's condition is the result of injury that occurred on March 2, 2002 when a car rolled over him, pinning his neck beneath a tire. (TR 99, 236, 314). The accident resulted in fractures to Plaintiff's cervical vertebrae and he underwent a series of surgeries, including two fusions, in the days following the accident. (TR 159, 161, 311-12).

Plaintiff testified that he has lower back pain where his back was fused. (TR 305, 313). Plaintiff testified that on a day to day basis his back pain is between five and eight on a pain scale of one to ten. (TR 314). In the mornings it is at about six or seven and if he does any yard work it goes up to eight. (TR 314). On a good day his pain rates five and he does not have any pain free days. (TR 315, 317). He can rake his yard or mow his lawn with a riding lawn mower for up to an hour and a half before he has to lie down. (TR 305). If he is outside when his back pain increases he will lie on his deck, which is a hard surface, and stretch out for about twenty minutes. (TR 315, 319). On a Function Report dated July 7, 2003 Plaintiff indicated that lifting, squatting, walking, sitting, climbing stairs and kneeling for "a little while" make his lower back hurt. (TR 80). He wears a back brace as needed. (TR 78).

Plaintiff also testified that he has intermittent neck pain that is sometimes triggered by sitting without support. (TR 321). Plaintiff has some weeks without neck pain. (TR 321). On August 30, 2005 Plaintiff responded to a questionnaire and indicated that the pain in his lower back and neck was severe when waking, was daily and constant, increases with activity and ranges from a 5 to 10

on a scale of 10. (TR 101).

Plaintiff testified that he can sit for one and a half to two hours before he has to stand and can stand for a couple of hours but then needs to sit, lie down or walk about one hundred yards to "loosen up." (TR 305, 312). He testified that he lies down about twice a day for anywhere from one to two hours each time. (TR 312, 320). Plaintiff watches about four hours of television a day while alternately lying and sitting on the couch. (TR 310). Plaintiff considers three hours of sleep a "good" night because he tosses and turns and cannot relax due to his back pain. (TR 76, 310).

Around the house Plaintiff washes dishes for approximately ten minutes at a time, does some house and yard work, mows the lawn, rakes, weed whacks for five minutes to an hour, does some cooking, washes the car, makes and changes the bed, vacuums, mops, sweeps takes the garbage out, and does a little hunting in the fall as a hobby. (TR 78, 308, 319-20). Plaintiff is able to prepare his own meals and food. (TR 77). Plaintiff drives and goes shopping approximately once a week for about an hour. (TR 78). At the hearing Plaintiff testified that he grocery shops about once a month and is able to carry the packages into the house. (TR 309). He also testified that he is able to lift fifty pounds, which is a bag of dog food for his three dogs. (TR 311). However, he does not lift this weight daily and he does not know if he could lift it daily or three to four times per day if required to do so by a job. (TR 319). Plaintiff reported that he could occasionally lift or carry fifty pounds, frequently lift or carry ten pounds, stand or walk less than two hours in an eight-hour workday, must alternate sitting and standing in an eight-hour day and his lower body was limited in pushing and pulling, including the use of foot controls. (TR 102). He also testified that he walks the dogs about a half mile although his back hurts and he gets short of breath. (TR 81, 311).

Plaintiff takes Avapro and Dyazide for his blood pressure, Motrin for back pain three to four

times a week and Tylenol Extra Strength for headaches. (TR 61, 89, 307). Plaintiff reported using Motrin, physical therapy and a TNS unit (1 ½ years prior) for pain relief. (TR 101). Plaintiff testified that in March to July 2004 he attended classes from eight a.m. until noon three days a week in an attempt to obtain his GED. (TR 306). Plaintiff testified at the hearing that he had been looking for work. (TR 307).

### *Medical Evidence*

Plaintiff underwent a series of surgeries following the March 2, 2002 accident. On March 3, 2002 Mark Jones, M.D. performed a placement of Gardner-Wells tongs to address a cervical fracture at C6-C7. (TR 164). On March 4, 2002 Dr. Jones performed a "[p]osterior cervical approach for reduction of bilateral facet dislocation, with vertex plating of C6-C7 bilaterally and placement of Songer cable tension band with right posterior iliac crest autograft" and an "[a]nterior cervical fusion, C6-C7, with 8mm iliac crest autograft, with 25 mm Atlantis plate with locking screws." (TR 161). On March 5, 2002 Plaintiff underwent a decompressive laminectomy, L1 and L2 with placement of fusion at L1/L2 via bone screws in the pedicle and iliac crest bone graft. (TR 159). Notes from Mark Adams, M.D. and Dr. Jones show "good recovery" and continued improvement in the days following the surgeries. (TR 153).

In April 2002 Dr. Jones noted that he thought Plaintiff would "be off work for at least four to five months," but with time would return to his flooring job. (TR 148). On May 14, 2002 Dr. Jones reported that Plaintiff appeared to be fusing, he had no pain in the neck and back, excellent return of function in the upper extremities, full grip, full finger extensors and full wrist extensors of the biceps and triceps. (TR 146). Examinations by Dr. Jones on June 18 and August 13, 2002 showed that Plaintiff was "doing quite well" and "extremely well." (TR 137-41). On September

25, 2002 Plaintiff saw Dr. Jones after he slipped, causing some lower back pain. (TR 134). Dr. Jones ordered an AP and lateral of Plaintiff's neck and lumbar to make sure there were no problems. (TR 134). The x-rays showed that the lumbar area fused "nicely," the cervical area appeared to be in the process of fusing, the lower portion was completely fused, and the upper portion was fused anteriorly and was starting to move backwards. (TR 133). Dr. Jones reported no "new changes." (TR 133).

Plaintiff reported treating with Daniel A. Duffy, D.O. from March 12, 2002. (TR 58). On May 29, 2002 Dr. Duffy noted that Plaintiff had adequate fusion in the neck and was able to remove his neck brace, displayed improvement in leg weakness, but also had mild right forearm weakness, neck pain and pain by the sacrum. (TR 272). He also complained of a "little bit" of an intermittent headache. (TR 272). Dr. Duffy diagnosed status-post cervical and lumbar fusion and ordered out patient therapy and an EMG of the upper extremities to evaluate the extent of cervical radiculopathy. (TR 273). The June 18, 2002 EMG showed bilateral C-6 and right C-7 radiculopathy. (TR 270). On August 13, 2002 Dr. Duffy noted that Plaintiff had followed up with his neurosurgeon, Dr. Jones and reported that the bones in his lumbar and cervical region fused appropriately. (TR 269). Dr. Duffy ordered that Plaintiff proceed with physical therapy in the hope of returning Plaintiff to work within a month either "with restrictions or without." (TR 269).

On September 16, 2002 Dr. Duffy noted that Plaintiff was making good gross improvements in physical therapy in his range of motion, repetition rate and function. (TR 268). In occupational therapy Plaintiff went through a functional capacity evaluation and Dr. Duffy had a "handwritten note describing him being able to obtain the medium physical demand levels." (TR 268). Plaintiff reported doing some floor tiling work at his own home to simulate his work environment and was

able to tolerate about two hours of the activity before back pain, stiffness and general aches prevent him from doing more work.  (TR 268).  Dr. Duffy opined that the most work Plaintiff would be able to tolerate at that point was two hours daily, five days a week.  However, if Plaintiff proceeded with his therapies and transitioned to a community fitness program, he would return to floor and tile work within approximately two months.  (TR 268).

On November 6, 2002 Plaintiff reported pain with prolonged kneeling, squatting and forward bending of his back and was skeptical about whether he would be able to return to his prior work. (TR 267).  Examination showed pain "directly at the upper levels of the iliac crest, laterally from the mid-line." (TR 267).  Plaintiff showed no muscle atrophy and his forward flexion was limited to about 65 degrees before he felt pulling in that direction.  (TR 267).  Dr. Duffy noted that Plaintiff's work hardening reports showed his increasing tolerance and ability to complete all activities reasonably. (TR 267).  His ability to squat was about "half of normal" and his ability to kneel was limited to about twenty minutes.  (TR 267).  Dr. Duffy recommended that Plaintiff continue the work hardening program for another month and add physical therapy and an aquatics program.  (TR 267).

On November 12, 2002 Dr. Jones reported that Plaintiff had excellent strength and negative straight leg raising and symmetrical reflexes in the lower extremities.  (TR 130).  Plaintiff reported some low back pain and was still attending physical and occupational therapy. (TR 130).  Dr. Jones reported that the bone fusions had healed and that Dr. Duffy would make the determination as to when Plaintiff could return to work.  (TR 130).  On January 3, 2003 Dr. Duffy referenced a functional capacity evaluation which determined that Plaintiff could lift fifty pounds occasionally, twenty pounds frequently and ten pounds constantly, with the ability to kneel for only fifteen

minutes at a time before taking a break for fifteen minutes. (TR 266). Examination showed minimal soleus muscle weakness and atrophy of the lumbar spine. (TR 266). On February 19, 2003 Plaintiff complained of continued low back pain. (TR 265). Examination showed continued lumbar stiffness. (TR 265). Plaintiff also had pain radiating from his right low back down his right proximal thigh anteriorly and laterally, but had good muscle tone through his legs and decent muscle strength in both lower extremities, with "a smooth symmetric gait but decreased ability to crouch and squat and an inability really to be on his ankles in any different directions." (TR 265). Dr. Duffy considered Plaintiff's work restrictions to be fairly stable over the "next several months" and expected to modify the restrictions somewhat based on Plaintiff's increased ability to do different tasks. (TR 265).

On March 11, 2003 Dr. Jones noted that Plaintiff was "completely fused" from his cervical fracture at C6-7 and lumbar fracture at L1-2. (TR 127). Dr. Jones reported that Plaintiff did not have any significant pain in the neck or back, had good strength in the upper and lower extremities and had not been able to return to his floor covering work because he could not tolerate being on his knees seven hours a day. (TR 127). Plaintiff was going to be retrained. (TR 127).

On April 9, 2003 Dr. Duffy reported that Plaintiff's cervical and lumbar fusion had satisfactorily healed and Plaintiff would continue with the same restrictions. (TR 264). Plaintiff showed increased muscle tone at the level of L-1, limited lumbar mobility, pain around the cervical thoracic junction, "maybe just a little higher at the C-6, 7 level," and no weakness or sensory change in the arms. (TR 264). On May 27, 2003 Plaintiff showed cervical decreased range of motion and limited range of motion at the area of the fusion. (TR 262). Dr. Duffy ordered a cervical tomogram of the C-6, 7 area. (TR 262). Dr. Duffy restricted Plaintiff to fifteen minutes of crouching, four

hours a day, five days a week, and limited lifting to a maximum of fifty pounds occasionally, twenty pounds frequently and ten pounds constantly. (TR 262-63).

On June 11, 2003 Dr. Duffy diagnosed cervical spinal pain with fusion and tension cephalgia. (TR 259). At the July 23, 2003 examination Dr. Duffy noted that Plaintiff reported that his physical therapy efforts were reducing the severity and frequency of his headaches. (TR 258). Dr. Duffy also noted that Plaintiff reported that he "does not feel that his current vocational counselor is very effective at helping him with his vocational retraining" and felt that the vocational counselor was "trying to steer him towards finding a job in a menial profession, paying no attention to his interest or previous skills." (TR 258). Dr. Duffy noted that Plaintiff could "still tolerate 15 minutes of activity at a time" and "several hours of activity in a typical day." (TR 258). Plaintiff had stable cervical and thoracic posture, pain and atrophy at the upper lumbar segments, and decreased mobility through the neck and back, consistent with a fusion. (TR 258). Dr. Duffy found no focal weakness in either of the arms or legs regarding Plaintiff's strength but he had pain during maneuvers of the lower extremities radiating to his low back. (TR 258). Dr. Duffy recommended that his restrictions should stay "as they were written in the past based on his FCE" and he thought Plaintiff "could tolerate a part time job but not full time work at this point." (TR 258).

On August 22, 2003 Plaintiff complained of "more neck pain and headaches again," and low back pain. (TR 257). Dr. Duffy also noted the Plaintiff's "headaches were almost completely resolved with his course of physical therapy more recently." (TR 257). Dr. Duffy diagnosed "[l]ow back pain with post-traumatic arthritis and muscular atrophy" and tension cephalgia. (TR 257). He noted that Plaintiff would resume physical therapy with a goal of becoming pain free and begin

to "work on strengthening at this point for the first time with a static instead of a dynamic lumbar stabilization program."

On March 8, 2004 Dr. Duffy diagnosed Plaintiff with "[l]ow back pain from degenerative causes, complicated by incomplete paraplegia related to his L-1 Fracture."  (TR 278).  An MRI showed degenerative disc changes at L-5 and S-1.  (TR 278).  On September 8, 2004 Dr. Duffy noted that Plaintiff complained of low back pain, right arm pain and neck stiffness.  (TR 277).  Plaintiff reported that he had not been able to get back to work, however he was able to tolerate a "few hours of activity around the house without anything too severe in his back."  (TR 277).  Dr. Duffy recommended physical therapy to strengthen the lumbar paraspinals and to reduce atrophy.  (TR 277).  On September 23, 2004 Dr. Duffy noted that Plaintiff's right arm was feeling better with his exercises, however, he was having cramping and some back pain.  (TR 276).  Dr. Duffy recommended Plaintiff continue exercise treatments with the Med-Ex machine focusing on lumbar spine recovery.  (TR 276).

On November 1, 2004 Dr. Duffy noted that Plaintiff's arm was cramping less but his back still hurt almost every day.  (TR 275).  Plaintiff reported being able to engage in some activities such as washing his car and weed whacking and raking for up to an hour at a time.  (TR 275).  Dr. Duffy reported that Plaintiff would "continue to have exacerbations as his muscle strength recuperates from the surgery."  (TR 275).  He didn't think Plaintiff would ever have "full function of his back due to muscle weakness around the fracture and neurologic damage at the level of the fracture," however, Plaintiff was "making good strides at maintaining a healthful life."  (TR 275).

Dr. Duffy referred Plaintiff for physical therapy treatment.  (TR 120, 123, 282).  In the April 2005 Monthly Progress Note for Pain the physical therapist noted that plaintiff reported his

headaches were "mild and insignificant," cervical pain and stiffness were mild and insignificant and pain was rated between two and eight on a ten scale. (TR 285). On May 11, 2005 Dr. Duffy noted that Plaintiff had been in physical therapy, had "really noticed a decrease in his neck pain and his headaches," and still had some intermittent back pain. (TR 279). Dr. Duffy recommended that Plaintiff continue physical therapy and return to see him in about six months. (TR 279).

The record also contains treatment notes from Annabelle A. Tolentino, M.D. from March 28, 2002 through February 25, 2003 for hypertension and blood pressure related complaints. (TR 183-92). Dr. Tolentino prescribed Avapro 150 mg daily on March 28, 2002 and increased it 300 mg daily and added Dyazide on April 19, 2002. (TR 191). Plaintiff discontinued Avapro on May 22, 2002. (TR 187). On February 25, 2003 Plaintiff complained of chest pain occurring over the past month. (TR 183). Dr. Tolentino advised Plaintiff to take Tylenol Extra Strength or Motrin for the pain. (TR 183). A stress echocardiogram was negative for ischemia and the x-ray showed right middle lobe pneumonia/atelectasis. (TR 177).

## ADMINISTRATIVE LAW JUDGE'S DETERMINATION:

The ALJ found that although Plaintiff met the disability insured status requirements through at least the date of her decision, had not engaged in substantial gainful activity since March 2, 2002, the alleged onset date, and suffered from status post traumatic fracture of cervical vertebrae, with fusion at both the cervical and lumbar region, with residual myofascial pain and referred headaches, all severe impairments, he did not have an impairment that met or equaled the Listing of Impairments. (TR 22). Additionally, the ALJ found Plaintiff's statements concerning the effects of his symptoms were generally credible, but not to the extent alleged, he could not perform his past relevant work and his non-exertional limitations did not allow him to perform the full range of light

work.  (TR 22).  The ALJ concluded that during a closed period from March 2, 2002 through November 17, 2003 Plaintiff could not make an adjustment to any work that existed in significant numbers in the economy.  (TR 22).  However, as of November 18, 2003, as a result of medical improvement, Plaintiff was capable of engaging in less than the full range of light work activity.  (TR 23).  Therefore he was not suffering from a disability under the Social Security Act.  (TR 23).

## STANDARD OF REVIEW:

Pursuant to 42 U.S.C. § 405(g), this Court has jurisdiction to review the Commissioner's final decisions.  Judicial review of the Commissioner's decisions is limited to determining whether her findings are supported by substantial evidence and whether she employed the proper legal standards.  *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Comm'r*, 127 F.3d 525, 528 (6th Cir. 1997).  Substantial evidence is more than a scintilla but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Walters*, 127 F.3d at 528.  It is not the function of this Court to try cases *de novo*, resolve conflicts in the evidence or decide questions of credibility.  *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

In determining the existence of substantial evidence, the court must examine the administrative record as a whole.  *See Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).  If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even if the reviewing court would decide the matter differently, *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion.  *See Her v. Commissioner*, 203 F.3d 388, 389-90

(6th Cir. 1999); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts").

## DISCUSSION AND ANALYSIS:

Plaintiff's Social Security disability determination was made in accordance with a five step sequential analysis. In the first four steps, Plaintiff was required to show that:

(1)     he was not presently engaged in substantial gainful employment; and

(2)     he suffered from a severe impairment; and

(3)     the impairment met or was medically equal to a "listed impairment;" or

(4)     he did not have the residual functional capacity to perform his relevant past work.

*See* 20 C.F.R. § 404.1520(a)-(f). If Plaintiff's impairments prevented him from doing his past work, the Commissioner, at step five, would consider his residual functional capacity (RFC), age, education and past work experience to determine if he could perform other work. If he could not, he would be deemed disabled. *See* 20 C.F.R. § 404.1520(g). The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform." *Her*, 203 F.3d at 391. To meet this burden, the Commissioner must make a finding "supported by substantial evidence that [the claimant] has the vocational qualification to perform specific jobs." *Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987). This "substantial evidence" may be in the form of vocational expert testimony in response to a hypothetical question, "but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments.'" *Id.* (citations omitted).

Plaintiff alleges that the ALJ's decision that Plaintiff's disability ended on November 17, 2003 is not supported by substantial evidence. (Pl's Br. at 2, docket no. 12). Plaintiff argues that the ALJ erred in relying on a functional capacity evaluation that was not part of the record and with which Plaintiff alleges his treating physician disagreed. (Pl's Br. at 2, docket no. 12). Plaintiff further argues that the ALJ erred in relying exclusively on the medical vocational guidelines without taking into account Plaintiff's non-exertional limitations and failed to give full credit to Plaintiff's testimony regarding the extent to which his pain limited his activity. (Pl's Br. at 2, docket no. 12).

***November 17, 2003 Functional Capacity Evaluation and Determination of Closed Period of Disability***

The ALJ found that Plaintiff was disabled for a closed period of time from March 2, 2002 through November 17, 2003 because Plaintiff retained the residual functional capacity to perform less than the full range of sedentary work. (TR 22). The ALJ found that as of November 18, 2003, as a result of medical improvement, Plaintiff was no longer disabled when he was found to have the residual functional capacity to perform less than the full range of light work[1]. (TR 23). Plaintiff argues that this finding is not supported by substantial evidence because a functional capacity evaluation (FCE) referenced in Plaintiff's treating physician's report is not part of the record and the treating physician allegedly disagreed with the FCE.

"In a 'closed period' case, the decision maker determines that a new applicant for disability benefits was disabled for a finite period of time which started and stopped prior to the date of his decision." *See Shepherd v. Apfel*, 184 F.3d 1196 n. 2 (10th Cir. 1999). "Typically, both the

---

[1] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.967(b).

disability decision and the cessation decision [in a closed period case] are rendered in the same document." *Id.* The medical improvement standard applies to cases involving a closed period of disability. *Id.; Niemasz v. Barnhart*, 155 Fed. Appx. 836, 839-40 (6th Cir. 2005). Once a claimant has been awarded disability benefits, an ALJ must find that there has been a medical improvement in the beneficiary's condition before terminating the claimant's benefits. Title 42 U.S.C. § 423(f) provides:

> A recipient of benefits under this subchapter . . . based on the disability of any individual may be determined not to be entitled to such benefits on the basis of a finding that the physical or mental impairment on the basis of which such benefits are provided has ceased, does not exist, or is not disabling only if such finding is supported by –
>
> (1) substantial evidence which demonstrates that –
>
>> (A) there has been any medical improvement in the individual's impairment or combination of impairments (other than medical improvement which is not related to the individual's ability to work), and
>>
>> (B) the individual is now able to engage in substantial gainful activity;

42 U.S.C. § 423(f)(1). Any improvement in the beneficiary's impairment meets the statutory standard for medical improvement. *See* 42 U.S.C. § 423(f); 20 C.F.R. § 404.1594(c)(1).

"To apply the medical improvement test, the ALJ must first compare the medical severity of the current impairment(s) to the severity of the impairment(s) which was present at the time of the most recent favorable medical decision finding the claimant disabled." *Shepherd* 184 F.3d at 1201. "Then, in order to determine that medical improvement is related to ability to work, the ALJ must reassess a claimant's residual functional capacity (RFC) based on the current severity of the

impairment(s) which was present at claimant's last favorable medical decision." *Id.*

On November 17, 2003 Dr. Duffy referenced a recently completed functional capacity assessment which is not part of the record. (TR 255). Dr. Duffy stated that the FCE "basically demonstrated [Plaintiff] to have the ability to start a light physical demand job, to have optional sit-stand. No work over his shoulders. He probably will be able to tolerate full-time work and lift a maximum of 30 pounds. (TR 255). Plaintiff argues that "Dr. Duffy's skepticism regarding the validity of a reported FCE is not evidence of the validity of the FCE." (Pl's Br. at 7, docket no. 12). Plaintiff argues that the following note by Dr. Duffy "clearly does not agree that Mr. Johnson is capable of full time work on November 17, 2003" (Pl's Br. at 7, docket no. 12): "I still feel that the vocational person working with Mr. Johnson hasn't fully explored the full realm of available jobs in a part-time position over the past several months and I am not sure that we will be able to jump Mr. Johnson from completely being off work to a full time job, however, I want to give it our best shot." (Pl's Br. at 6-7, docket no. 12, TR 255). Dr. Duffy's notations from November 17, 2003 do not indicate skepticism or disagreement with the results of the referenced FCE as Plaintiff speculates. Nowhere in the November 17, 2003 report does Dr. Duffy recommend further limiting Plaintiff beyond those restrictions. On March 8, 2004 Dr. Duffy noted that Dr. Jones released Plaintiff to work "within the light duty restriction that I had outlined." (TR 278). Dr. Duffy further noted that he had "outlined restrictions for his workplace as guidelined by his November FCE." (TR 278). Dr. Duffy's continued reference to the November 17, 2003 restrictions support the ALJ's conclusions. Plaintiff also argues that because the referenced FCE is not part of the record it does not constitute substantial evidence. 20 C.F.R. § 405.360 provides that "[a]ll evidence upon which the administrative law judge relies for the decision much be contained in the record, either directly

or by appropriate reference." (Pl's Br. at 7, docket no. 12). Plaintiff does not provide legal authority to support an assertion that Dr. Duffy's summary of the FCE does not constitute "appropriate reference." Dr. Duffy's November 17, 2003 report references the FCE and his report incorporates both exertional and nonexertional restrictions which Dr. Duffy continues to reference in later reports. The evidence relied upon by the ALJ is appropriately referenced.

Furthermore, any error in considering an FCE not within the record except by reference is harmless error because the record contains, and the ALJ's decision references, other substantial evidence in the record supporting the ALJ's determination that after November 17, 2003 Plaintiff underwent medical improvement resulting in his ability to perform less than the full range of light exertional work. Prior to November 18, 2003, Dr. Duffy was evaluating Plaintiff's ability to tolerate a job. On June 11, 2003 Dr. Duffy noted that Plaintiff was accompanied by his vocational case manager and that they had used the vocational case manager's functional capacity evaluation in the past to design Plaintiff's "return to work plan" so they would "probably need another functional capacity evaluation" if they were going to change the plan. (TR 260). Dr. Duffy noted that he would like to delay that until they have "worked out some of the problems with his neck pain and arm symptoms, as well as headache." (TR 260).

The ALJ cited Dr. Duffy's approval of a part-time work schedule in July 2003. (TR 20, 258). Furthermore, a state agency physician concluded on July 16, 2003 that Plaintiff had exertional limitations within the definition of "light" work. (TR 221). He found Plaintiff able to occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk about six hours in an eight-hour workday, sit for about six hours in an eight-hour workday and found limitations in pushing and/or pulling with the upper and lower extremities to the extent that he could

only occasionally push and/or pull. (TR 221).

On September 17, 2003 Dr. Duffy noted concern over Plaintiff working a full-time job due to de-conditioning and limited Plaintiff in performing duties that would be impacted by the weakness and atrophy of his lumbar spine. (TR 20, 256). Dr. Duffy noted that plaintiff was sending out resumes, but had been unsuccessful in finding a job. (TR 256). Dr. Duffy noted that Plaintiff had a "vocational handicap" but also had "[i]mproving functional status despite continued headache pain." (TR 256). The doctor noted that Plaintiff's headaches are controlled with Tylenol, however Plaintiff was somewhat resistant to "taking a lot of Tylenol." (TR 256). Dr. Duffy recommended that they "redo a functional capacity evaluation" to determine Plaintiff's ability to tolerate a job. (TR 256). The doctor noted that the lingering headaches "seem satisfactorily controlled" and that as long as they were not increasing or uncontrolled Dr. Duffy "would be satisfied that he continue to have headaches, despite being able to work." (TR 256). Dr. Duffy would not want him in a job "where he is in (sic) unable to perform the duties of the job based on weakness and atrophy of his lumbar spine as a result of the fractures and this seems to be the main thing stopping him at this point." (TR 256).

The ALJ's decision that as of November 18, 2003 Plaintiff had the ability to perform less than the full range of light work activity is supported by substantial evidence.

### *Plaintiff's Credibility*

The ALJ's conclusions regarding credibility should be accorded deference and should not be discarded lightly because the ALJ has the opportunity to observe the demeanor of a witness. *See Casey v. Sec'y of Health and Human Servs.,* 987 F.2d 1230, 1234 (6th Cir. 1993). A finding that a claimant is not credible must be supported by substantial evidence in the same manner as any other

ultimate factual determination. To the extent that the ALJ found that Plaintiff's statements are not substantiated by the objective medical evidence in the record, the Regulations explicitly provide that "we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work . . . solely because the available objective medical evidence does not substantiate your statements." 20 C.F.R. § 416.929(c)(2). In addition to objective medical evidence, the ALJ must consider: (1) the claimant's daily activities, (2) the location, duration, frequency, and intensity of claimant's pain, (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms, (5) treatment, other than medication, for pain relief, (6) any measures used to relieve the pain, and (7) functional limitations and restrictions due to the pain. *See* 20 C.F.R. § 404.1529(c)(3); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994) (applying these factors).

The ALJ found that Plaintiff's statements regarding symptoms and resulting limitations were credible, but not to the extent alleged. (TR 20). The ALJ properly referenced Plaintiff's specific activities of daily living, including Plaintiff's participation in but limited tolerance for "heavier exertional activities," which undercuts Plaintiff's assertions of total disability. (TR 20-21). The ALJ also referenced medical records documenting Plaintiffs ongoing complaints of headaches and back pain, and considered Plaintiff's ability to treat the pain with over-the-counter medications. (TR 21, 284). The ALJ considered Plaintiff's reports of daily back pain on a scale of five to eight out of ten and Plaintiff's reports to his physical therapist that document a decrease in pain with physical therapy to four out of ten. (TR 21, 286). There is substantial evidence in the record and cited by the ALJ to support the ALJ's conclusion that Plaintiff's complaints of symptoms and their resulting

limitations were not credible to the extent alleged by Plaintiff.

### *The Medical-Vocational Guidelines and Non-Exertional Limitations*

Plaintiff alleges that the ALJ relied exclusively on the medical-vocational guidelines without taking into account Plaintiff's non-exertional limitations. However, the ALJ did not rely exclusively on the guidelines to determine that there was a significant number of jobs available in the economy which Plaintiff could perform. The ALJ properly referenced the regulations, Pt. 404, Subpt. P, App. 2, Rule 202.20[2], 20 C.F.R. §404.1569 as a framework which would direct a conclusion of "not disabled" and further relied on the Vocational Expert's (VE) testimony to determine what effect Plaintiff's non-exertional limitations would have on the number of jobs available in the economy. (TR 21, 322-25).

The VE testified that Plaintiff's past work as a carpenter's helper was heavy and unskilled and his past work as a tile finisher was medium and semi-skilled with no transferable skills. (TR 323). The ALJ asked the VE to assume a person of the same age, education and past relevant experience as Plaintiff with the ability to lift and carry twenty pounds occasionally and ten pounds frequently, sit for six hours of a work day and stand or walk six hours of a work day, he should not engage in frequent pushing or pulling with either upper or lower extremities, is precluded from any work above shoulder level and should not frequently stoop, kneel, crouch, crawl, climb or work at

---

[2]The ALJ referenced Rule 202.20 which denotes a younger individual (age 18-49) with a high school education and unskilled or no previous work experience. (TR 21). The ALJ found that Plaintiff completed the tenth grade and participated in a GED course, however, there is no evidence indicating that Plaintiff completed the GED course. This is harmless error. Even if Plaintiff were considered under Rule 202.17, a younger individual with limited or less education and at least literate and able to communicate in English, with unskilled or no previous work experience, the Grid would direct a decision of not disabled. 20 C.F.R. Ch. III, Pt. 404, Subpt. P, App. 2.

heights.  (TR 323).  The VE testified that this individual would not be able to perform Plaintiff's past relevant work, however, there would be other work in the economy in the sedentary and light unskilled categories which the individual could perform.  (TR 324).  The ALJ then added the necessity of a sit/stand option to the hypothetical.  (TR 324).  The VE testified that the positions available would be reduced to approximately 9,000 assembler positions in Michigan and 18,000 cashier positions.  (TR 324).  The VE further testified that even if the individual needed to walk for about five minutes after two hours of sitting or two hours of standing, the assembler and cashier positions would still be available.  (TR 324).  The ALJ then asked the VE if the individual had pain "to a moderate degree throughout the day which would interfere with the person's ability to maintain attention and concentration to a moderate degree throughout the day" whether he would still be able to do the two positions.  (TR 325).  The VE testified that if the moderate degree were to be termed as fifty percent of the day, then the individual would not.  (TR 325).

In a hypothetical question posed to the VE, an ALJ is required to incorporate only those limitations which he finds credible and supported by the record.  *See Casey v. Sec'y of Health and Human Serv.,* 987 F.2d 1230, 1235 (6th Cir. 1993).  The ALJ's hypothetical question to the VE incorporated all aspects of Plaintiff's RFC, including non-exertional limitations that the ALJ found credible and supported by the record.  The ALJ was not required to find that Plaintiff had pain to an extent that would interfere with his ability to maintain attention and concentration to a moderate degree throughout the day.  As set forth above, substantial evidence supports the ALJ's determination that Plaintiff is not entirely credible regarding the extent of his symptoms and resulting limitations.

The ALJ found that as of November 18, 2003 Plaintiff had the RFC to perform light work

activity with allowance for alternating positions which equated to less than the full range of light exertional activity. (TR 20). The limitations which the ALJ found credible were properly included in the hypothetical to the VE. The ALJ properly relied on the VE's testimony to determine what effect Plaintiff's non-exertional limitations would have on the number of jobs available, while referencing the grid as a framework only.

## CONCLUSION

The ALJ's opinion is supported by substantial evidence. Defendant's Motion for Summary Judgment (docket no. 16) should be granted, that of Plaintiff denied and the instant complaint dismissed.

## REVIEW OF REPORT AND RECOMMENDATION:

Either party to this action may object to and seek review of this Report and Recommendation, but must act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to Rule 72.1(d)(2) of the *Local Rules of the United States District Court for the Eastern District of Michigan*, a copy of any objection must be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing

party may file a response.  The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.


Dated: April 22, 2008                                    s/ Mona K. Majzoub_____
                                                                      MONA K. MAJZOUB
                                                                      UNITED STATES MAGISTRATE JUDGE


## PROOF OF SERVICE

I hereby certify that a copy of this Report and Recommendation was served upon Counsel of Record on this date.

Dated: April 22, 2008                                    s/ Lisa C. Bartlett_____
                                                                      Courtroom Deputy